**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ALFONSO TORRES-CHAVEZ, )<br>)<br>Defendant. ) | Case No.  09 CR 967 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On September 29, 2011, following a four day trial, the jury returned a verdict of guilty as to Defendant Alfonso Torres-Chavez on each of five narcotics-related counts charged in the Superseding Indictment.  Presently before the Court is Defendant's Motion for Judgment of Acquittal, Arrest of Judgment or New Trial.  (R. 89.)  For the reasons set forth below, the Court denies Defendant's motion.

## BACKGROUND

A federal grand jury returned a Superseding Indictment, on September 14, 2010, charging Defendant, along with co-defendant Bartolo Lucatero and others, with (1) conspiracy to possess with the intent to distribute and to distribute controlled substances, namely, mixtures containing cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 ("Count One"); (2) possession with intent to distribute a controlled substance, namely, mixtures containing cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 ("Count Three"); and (3) using a communication facility, namely, a cellular telephone, in facilitating the conspiracy to possess with the intent to distribute and to distribute cocaine, in violation of 21 U.S.C. § 843(b) ("Counts Five, Six, and

Seven").  (*See* R. 30, Super. Indict. at 1-5, 7, 9-11; R. 74, Parties' Agreed Stmnt of the Case.)

At his arraignment on October 12, 2010, Defendant pleaded not guilty to each of the counts charged in the Superseding Indictment.  (R. 40.)  Lucatero pleaded guilty on October 15, 2010 pursuant to a written plea agreement in which he agreed to cooperate with the government. (R. 43.)  The case against Defendant proceeded to a jury trial.

## I.      Trial Proceedings

The trial began with jury selection on September 26, 2011.  During *voir dire*, the Court advised the potential jurors that "[t]he defendant has an absolute right not to testify in the case, and no inference or suggestion of guilt c[an] be drawn from th[at] fact if he chooses not to testify in the case.  That is his constitutional right."  The Court asked if "that constitutional right" concerned any of the potential jurors.  None of the potential jurors responded in the affirmative.

The government presented numerous witnesses at trial, including Drug Enforcement Administration ("DEA") Special Agent Charles Baumgartner, Interpreter Catalina Maria Johnson, linguist Stephanie Skelskey, inmate Jorge Ayala-German, cooperator Bartolo Lucatero, DEA Special Agent Kirk Seeley, and DEA Special Agent Wilfred Taylor.  During his testimony, Lucerdo testified that Defendant obtained five kilograms of cocaine from a drug trafficking organization based in Michoacan, Mexico, known as "La Familia Michoacana" or "La Familia." The drug organization "fronted" the five kilograms of cocaine to Lucatero and Defendant, who intended to distribute the cocaine to an individual known as "Lito."  After a series of phone calls and meetings, Lucatero obtained the five kilograms of cocaine from the associate of an individual known as Jose Gonzalez-Zavala, the organization's distributor in Chicago who also went by the alias "Panda."  Lucetero then drove to an apartment building in Chicago where

Defendant had an apartment. Defendant's roommate brought Lucatero a key to the apartment, and they stored the five kilograms of cocaine in Defendant's closet in the apartment. The next day, Defendant paid Lucatero $700 for delivering the cocaine to his apartment, and told Lucatero that the five kilograms of cocaine had been sold.

Lucatero further testified that Defendant subsequently informed him that "Lito" would contact Lucatero in order to deliver money from the sale of the five kilograms of cocaine. Lucatero subsequently received $74,000 from "Lito." Defendant instructed Lucatero to set aside approximately $1,500 from these drug proceeds. On May 28, 2009, Lucatero met with several associates of Gonzalez-Zavala and gave them the $72,500 in cash drug proceeds. He then called Gonzalez-Zavala and confirmed that he had delivered the money.

In addition to the testimony of Lucatero, the government presented the testimony of law enforcement agents who witnessed Lucatero meet with members of the La Familia Michoacana organization for the purpose of obtaining cocaine, and photographs of property seized during a search of the organization's stash houses, including over $1.3 million and 54 kilograms of cocaine, from which the 5 kilograms of cocaine that were delivered to Lucatero for Defendant originated.

The government also introduced approximately two dozen recorded conversations intercepted from a Title III wiretap on various telephones utilized in the conspiracy. These intercepted phone calls involved Defendant and others discussing a May 2009 cocaine transaction, and specifically recorded various co-conspirators discussing the distribution of kilogram quantities of cocaine and the payment for these drugs. (*See, e.g.*, Call No. 119, 5/27/09 at 9:10 a.m. (recording of cell phone conversation in which Defendant informs Panda that

Defendant has "a black shirt on," so that Panda or his associates would recognize Defendant and complete a drug-related transaction).)

Defendant exercised his constitutional right not to testify at trial, and the defense did call any witnesses to testify. On September 28, 2011, before closing arguments, the Court "reminde[d]" the jury that "the government has the burden of proof. The defendant does not have to put on any evidence." The parties gave their closing arguments, and the Court thereafter charged the jury. In its instructions, the Court again instructed the jury that "[t]he defendant has an absolute right not to testify. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." (R. 81, No. 12.) On September 29, 2011, following deliberations, the jury returned a verdict of guilty as to Defendant on all counts charged in the Superseding Indictment.

## II.    Subsequent Jury Service

After the jury returned its verdict and the Court excused the jurors from this case, the jurors returned to the jury pool for their second week of jury service in accordance with the Local Rules and practices of the Northern District of Illinois. *See, e.g.*, Local Rule 47.1(a); "Jury Information," N.D. Ill., *available at* http://www.ilnd.uscourts.gov/home/JuryInfo.aspx (Dec. 12, 2011). Several of the jurors were questioned as potential jurors in subsequent and unrelated criminal trials. The Court summarizes the relevant portions of the *voir dire* of three jurors – Jurors A, B, and C – from these unrelated trials.

### A.    Juror A

On October 3, 2011, following his jury service in this case, Juror A participated in jury selection in another matter, *United States v. Gore*, No. 09 CR 248 (Gottschall, J.) The following

colloquy took place during *voir dire*:

> THE COURT: [Y]ou indicated that you would have some problems if the defendant did not testify in this case, am I right about that?

> JUROR A: Yes.

> THE COURT: . . . . [I]f you're in this courtroom situation and if you are instructed the government has the burden, the defendant has the right not to testify, would you be able to follow that instruction?

> JUROR A: I would try, but it's hard because the last case we tried last week it was like the same thing. He didn't testify. Me, I probably want to hear from the other side.

> THE COURT: Did the Judge instruct you that you shouldn't consider whether or not he testified?

> JUROR A: I mean, yeah, but –

> > \* \* \* \*

> THE COURT: . . . . Do you think you could be fair and follow the law . . . ?

> JUROR A: I don't know. From the last trial I just don't understand nobody not testifying. That's just me.

> THE COURT: Well, did the jury evaluate the government's evidence in that case?

> JUROR A: I mean, yeah, they did, but it was just me. I don't know about anybody else.

> THE COURT: [W]ere you able to decide whether or not the government had carried its burden of proof?

> JUROR A: Yeah, a little bit. A little. But I still had the doubt as soon as I heard the case knowing he was not defending himself. I still had the little doubt in my head that he probably did it.

> > \* \* \* \*

> THE COURT: So apart from feeling like maybe you didn't hear both sides, do you feel that the trial was unfair?

| | |
|---|---|
| JUROR A: | Not really. |

*   *   *   *

| | |
|---|---|
| THE COURT: | Do you understand that [the defendant has a right to not testify and that exercise of that right cannot be used against him]? |
| JUROR A: | I understand it, but I still -- I felt -- I still think I have an opinion about the situation too. |
| THE COURT: | . . . . If you can't follow the law, you should not be on the jury.  If you can follow the law, you should be on the jury.  It's that easy. |
| JUROR A: | I probably wouldn't, being honest. |

(R. 91, Ex. 3, *United States v. Gore*, No. 09 CR 248-1, Trial Tr.1B at 2-6.)  The trial court thereafter excused Juror A for cause.  (*Id.* at 6.)

**B.      Juror B**

Juror B also participated in jury selection in *United States v. Gore*.  After a preliminary colloquy, the following exchange took place:

| | |
|---|---|
| COUNSEL: | [Juror B] indicated I think she might have difficulty with a defendant who didn't testify. |
| JUROR B: | I did raise my hand for that, and I served last week and I didn't raise my hand for that question last week.  After my experience last week, I'm sorry, but I couldn't help it, but that entered into my thought process when I was trying to reach a verdict, that he did not testify.  And I felt that if he would have said I wasn't there, I have an alibi, I would have maybe believed him more. |
| THE COURT: | . . . . So I guess the question is if that is what you're instructed, and that will be what you're instructed, can you follow that instruction? |
| JUROR B: | Well, I can say that I will try.  But if you want me to be honest, I was surprised about how that did affect me, how I felt after the last trial. |

*   *   *   *

| THE COURT: | And I need you -- I need you to be able to commit that you can follow [my instructions the defendant's right not to testify]. |
| --- | --- |
| JUROR B: | I can say that I can follow those instructions, but whether or not it's in the back of my mind truthfully I can't say. |

*   *   *   *

| JUROR B: | The last case it involved a wiretap, whether there was voice evidence. And I think he didn't want to speak. I think he didn't want us to hear his voice. It's very hard not to assume there was a reason he didn't want us to hear his voice. Now, the jury did reach a decision. We did, but we did all bring that subject up. A lot of us I should say. And I think we deliberated maybe six hours. . . . . |
| --- | --- |
| THE COURT: | The judge told you that shouldn't enter into your deliberations? |
| JUROR B: | Oh, certainly. Certainly. . . . |

*   *   *   *

| JUROR B: | I am being honest when I say one of the first things that came into my mind, well, why doesn't he have an alibi? Why doesn't he say where he was? Why doesn't he defend himself? |
| --- | --- |

(*Id.* at 7-17.) Upon further questioning, Juror B could not unequivocally commit to following the trial judge's instructions in that case, and the trial court accordingly excused Juror B for cause.

## C.     Juror C

On October 4, 2011, following his jury service in this case, Juror C participated in jury selection in another matter, *Untied States v. Brunt*, No. 07 CR 853 (Guzman, J.), during which the following exchange took place:

| THE COURT: | And is there anything about [the prior case] that you feel leaves you predisposed to favoring one side or the other in this case? |
| --- | --- |
| JUROR C: | Yeah. The defendant didn't testify and that - - |

THE COURT:          Okay.

JUROR C:            – really bothered –

THE COURT:          And did that leave you with some sense of unfairness?

JUROR C:            [Y]es, it did.  I didn't feel it was tried right and I - you know what?
                    After - I didn't really come to a conclusion until after I went home
                    that night, and the whole way home I was thinking about it and
                    I've been thinking about it ever since.  I wasn't sure.  I kind of felt
                    like, you know - at the time I thought we were doing the right thing
                    but it just kept on playing in my head that I wasn't sure about it.

THE COURT:          . . . . Can you follow [the] principle whether you [] agree [] or not?

JUROR C:            I could follow it.

THE COURT:          Are you satisfied in your own mind that you can [do so]?

JUROR C:            My only - my answer on that was, I thought I could before and I
                    thought I was - I thought I was satisfied, but then afterwards these
                    are the questions that I've been milling around with since
                    Thursday afternoon.

                              *    *    *    *

THE COURT:          . . . .[C]an you not hold it against any defendant if he or she does
                    not testify? . . . .

JUROR C:            I believe so.  I - - yeah, I believe so.  I mean, that was my
                    questions. That's where I'm sitting right now.  But I believe so.
                    I'm not sure but I believe so.

                              *    *    *    *

THE COURT:          Is there anything about th[e former] case that leaves you with a
                    predisposition to favor one side or the other in this case or that
                    leaves you with any doubts about your ability to be fair and
                    impartial in this case, sir?

JUROR C:            Just what we spoke about before.  I just didn't feel - - I felt there
                    were some holes after we left.  That's pretty much the gist of it.

                              *    *    *    *

8

| THE COURT: | . . . [C]an [you] be fair to both sides in this case? |
| JUROR C: | If it's yes or no, yes. |
| THE COURT: | Very well. |

(*Id.* at 1-6.)

## STANDARD OF REVIEW

Defendant brings his post-trial motion pursuant to Rules 29(c), 33 and 34 of the Federal Rules of Criminal Procedure. (R. 89, Def.'s Mot. at 1.) The Court begins with a discussion of the applicable standard of review.

## I.     Motion for Judgment of Acquittal

Under Rule 29(c), "[a] district court should grant a motion for a judgment of acquittal only when there is insufficient evidence to sustain a conviction." *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008); *see also United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009). A court reviewing a Rule 29 motion should "view the evidence in the light most favorable to the government and ask whether any rational jury could have found the essential elements of the charged crime beyond a reasonable doubt." *Presbitero*, 569 F.3d at 704; *see also United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010); *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *United States v. Bolivar*, 532 F.3d 599, 603 (7th Cir. 2008); *Moses*, 513 F.3d at 733; *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002). A court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *Presbitero*, 569 F.3d at 704 (quoting *Moses*, 513 F.3d at 733).

## II.  Motion for a New Trial

Under Rule 33, "a district court 'may vacate any judgment and grant a new trial if the interest of justice so requires.'"  *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005); *see also United States v. Christ*, 513 F.3d 762, 775 (7th Cir. 2008).  "[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (internal citation and quotation marks omitted), *overruled on other grounds*, *Eberhart v. United States*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005)).

"'A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'"  *Eberhart*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)).  Accordingly, a court may grant a new trial if the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded.  Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses.").  "The court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'"  *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)); *see also Presbitero*, 569 F.3d at 706 (quoting *Washington*, 184 F.3d at 657-58).

**III.    Motion to Arrest Judgment**

Under Rule 34, the Court "must arrest judgment" if either "(1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction of the charged offense."  Fed. R. Crim. P. 34(a).

**ANALYSIS**

In seeking post-trial relief from his conviction, Defendant makes five arguments, namely that (1) "jury bias tainted the trial," (2) "there is insufficient evidence to sustain the conviction," (3) "improper labeling of transcripts prejudiced" Defendant, (4) "*voir dire* did not adequately screen for Spanish-speaking jurors, nor was the jury instructed properly not to interpret wiretaps," and (5) the "Court should not have permitted the government to call an unreliable cooperating witness to identity the defendant's voice based on such inadequate bases."  (Def.'s Mot. at 2, 21-23.)  The Court addresses each argument in turn.

**I.    Juror Bias**

Defendant first seeks a new trial on the basis of juror bias.  Defendant contends that the jury impermissibly "held it against [Defendant] that he did not testify."  (Def.'s Mot. at 18); *see also Carter v. Kentucky*, 450 U.S. 288, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981) (discussing the constitutional privilege against self-incrimination).  Defendant explains that "[t]hree jurors (at least) are on the record, under oath, disclosing that they held a bias against the defendant during their deliberations."  (*Id.*)

**A.    Legal Standard**

"The Fifth and Sixth Amendments guarantee due process of law and trial by an impartial jury."  *Arreola v. Choudry*, 533 F.3d 601 (7th Cir. 2008) (quoting *United States v. Brodnicki*,

516 F.3d 570, 574 (7th Cir. 2008)); *see also United States v. Blitch*, 622 F.3d 658, 664 (7th Cir.

2010) (citing *Murphy v. Florida*, 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975)

("The constitutional standard of fairness requires that a defendant have a panel of impartial,

indifferent jurors.") (internal quotation marks and citation omitted)). An impartial jury in this

context "means a jury capable and willing to decide the case solely on the evidence before it,"

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982), and consistent with

the trial court's instructions. *See, e.g.*, *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222,

119 L. Ed. 2d 492 (1992). Trial before a *partial* jury, or a jury otherwise tainted by bias, is

grounds for a new trial, or reversal of a conviction on appeal. *See Blitch*, 622 F.3d at 655

(collecting cases).

Where, as here, an allegation of juror bias arises after the verdict, and is based on the

post-verdict testimony of jurors, the Court's inquiry into the validity of the verdict is "severely

restrict[ed]." *Arreloa*, 533 F.3d at 608. Rule 606(b) of the Federal Rules of Evidence,[1] which

governs the competency of a juror as a witness, and thus the admissibility of juror statements,

during an inquiry into the validity of a verdict, provides as follows:

**(b) During an Inquiry into the Validity of a Verdict or Indictment**

    **(1) Prohibited Testimony or Other Evidence**. During an
inquiry into the validity of a verdict or indictment, a juror may not

---

[1]Certain amendments to the Rule 606(b) became effective on December 1, 2011, after
Defendant filed the present motion. For purposes of this Opinion, the Court relies on the Rule as
amended. The amendments to the Rule were part of a general restyling of the Federal Rules of
Evidence that effectuated no substantive change to Rule 606(b). *See* Order of the United States
Supreme Court Pursuant to the Rules Enabling Act (Apr. 26, 2011) (transmitting amendments to
Congress and stating that the amendments to the Federal Rules of Evidence "shall govern in all
proceedings thereafter commenced and, insofar as just and practicable, all proceedings then
pending.").

testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**(2)  Exceptions.** A juror may testify about whether:

**(A)** extraneous prejudicial information was improperly brought to the jury's attention;

**(B)** an outside influence was improperly brought to bear on any juror; or

**(C)** a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b).

As the Advisory Committee recently explained, the Rule "offers an accommodation between the[] competing considerations" of (1) "freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment," and (2) preventing "irregularity and injustice." Fed. R. Evid. 606(b) – Adv. Comm. Notes. As to the first consideration, the Seventh Circuit, and the Supreme Court,[2] have frequently emphasized the strong public interest in "protect[ing] jurors from harassment and intimidation and enhanc[ing] the finality of jury verdicts." *Stephenson v. Wilson*, 619 F.3d 664, 671 (7th Cir. 2010); *see also*

_____

[2]In an oft-quoted discussion, the Supreme Court explained: "[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference." *Tanner,* 483 U.S. at 119-20 (quoting *McDonald v. Pless*, 238 U.S. 264, 267-68, 35 S. Ct. 783, 59 L. Ed. 1300 (1915)).

*Tanner,* 483 U.S. at 119-20.

In assessing the admissibility of post-verdict juror statements for the purpose of impeaching the verdict, the plain language of Rule 606(b) distinguishes between evidence of internal matters or influences, which is not admissible, and evidence of extraneous or external matters or influences, which may be admissible. *Compare* Fed. R. Evid. 606(b)(1) (statements or incidents "that occurred during the jury's deliberations; "effect of anything" on a juror's vote; or "any juror's mental processes" relating to the verdict) *with* Fed. R. Evid. 606(b)(2) ("extraneous prejudicial information"; "outside influence"); *see also United States v. Febus*, 218 F.3d 784, 795 (7th Cir. 2000) ("Since the juror's statements in this case only involved internal deliberations, and alleged no extraneous influences, this claim [of jury bias] fails."); *United States v. Delatorre*, 572 F. Supp. 2d 967, 992 (N.D. Ill. 2008) (citing *Tanner*, 483 U.S. at 121).

### B.      The Post-Verdict Statements are Barred by Rule 606(b)

In this case, Defendant's proffered evidence consists of the post-verdict statements of three individuals who served as jurors in this case – Jurors A, B, and C. Each of these jurors participated in *voir dire* in unrelated criminal cases following their jury service in this case. The first question is whether the proffered evidence falls within the scope of Rule 606(b), and second, if so, whether it is admissible under the Rule for purposes of impeaching the verdict in this case.

As to the first question, the evidence falls squarely within the scope of the Rule. Unlike allegations of juror misconduct or bias that arise prior to the verdict, the allegations of bias in this case arose post-verdict and are based exclusively on the post-verdict statements of three jurors. (*See* Def.'s Mot. at 2-21 (summarizing the post-verdict testimony of three jurors).)

Defendant seeks to use post-verdict *voir dire* statements to impeach the jury verdict, the exact circumstance contemplated and carefully governed by the plain language of the Rule. *See* Fed. R. Evid. 606(b)(1); *United States v. Morales*, 655 F.3d 608, 630 (7th Cir. 2011) (distinguishing between pre-verdict and post-verdict allegations of misconduct). The question therefore becomes whether the testimony is admissible for the purpose of impeaching the verdict.

Consistent with the overwhelming weight of authority, the Court concludes that the jurors' post-verdict statements at issue are inadmissible for that purpose. The statements show, at best, the internal mental processes of these jurors regarding the jury's internal deliberative process leading up to their verdict. *See Febus*, 218 F.3d at 795. Nothing in the record suggests the existence of any extraneous influence on the verdict. Introducing the evidence offered by Defendant would improperly subject the jury's internal deliberative process, including their mental processes, to inappropriate public scrutiny. Rule 606(b) is unmistakable in its prohibition on juror testimony concerning "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1); *see also Morales*, 655 F.3d at 631 n.6. Defendant seeks to do precisely what Rule 606(b) prohibits.

The federal appellate courts are unanimous in concluding that Rule 606(b) bars the impeachment of a jury verdict with a juror's post-verdict statement about improper consideration of a defendant's failure to testify. *See, e.g.*, *United States v. Kelley*, 461 F.3d 817, 832 (6th Cir. 2006); *United States v. Rutherford*, 371 F.3d 634, 639 (9th Cir. 2004); *United States v. Tran*, 122 F.3d 670, 672-73 (8th Cir. 1997); *United States v. Martinez- Moncivais*, 14 F.3d 1030, 1036-37

(5th Cir. 1994); *United States v. Voigt*, 877 F.2d 1465, 1469 (10th Cir. 1989); *United States v. Friedland*, 660 F.2d 919, 927-28 (3d Cir. 1981). Defendant recognizes that the weight of authority is against him, but distinguishes the present case from those cases on the basis that Defendant offers juror statements that were made after receiving the oath.[3] (R. 93, Def.'s Rep. at 3-4.) The Rule, however, makes no such distinction. Nor does Defendant cite any case law that would permit the admission of post-verdict juror statements, otherwise inadmissible under Rule 606(b), simply because the statements at issue were under oath.

Although no Seventh Circuit case is directly on point, the law in this Circuit is clear that post-verdict statements about the deliberative process, including statements relating to intra-jury influences, communications, arguments, statements, discussions, mental and emotional reactions, votes, and even misconduct, are internal influences within the prohibition of Rule 606(b). *See Morales*, 655 F.3d at 630-63; *Untied States v. Briggs*, 291 F.3d 958 (7th Cir. 2002) (holding that in the absence of evidence of physical coercion, a juror's post-verdict statement that she felt pressured to arrive at her verdict showed only an "intrajury influence on the verdict during the deliberative process," and was thus barred under Rule 606(b)); *Febus*, 218 F.3d at 975 (holding that a juror's post-verdict statements to a newspaper about being confused by the court's instructions and pressured by other jurors were inadmissible under Rule 606(b)); *United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995) (holding that post-verdict statements about being confused by the trial court's instructions were inadmissible under 606(b)); *United States v. Ford*,

---

[3]The transcripts provided by the parties in connection with the present motion do not make clear whether the trial courts in *Gore* and *Brunt* placed the jurors under oath. The Court will presume, for purposes of this discussion, that the jurors at issue made their statements under oath, as Defendant asserts.

840 F.2d 460 (7th Cir. 1988) (holding that a post-verdict letter from a juror, stating that misconduct occurred during deliberations, was inadmissible under Rule 606(b) because it showed merely "intrajury influences on the verdict during the deliberative process").

Because Rule 606(b) bars the post-verdict statements at issue, Defendant has offered no competent evidence of juror bias, and he is therefore not entitled to a new trial on that basis.[4] *See United States v. Delatorre*, 572 F. Supp. 2d 967, 992 (N.D. Ill. 2008) (holding that where the defendant failed to offer any competent evidence of juror bias within the meaning of Rule 606(b), his claim failed).

Additionally, the Court denies Defendant's request for an evidentiary hearing to further develop the record. *See Morales*, 655 F.3d at 630-31 (upholding district court's refusal to hold an evidentiary hearing on juror misconduct where the evidence elicited at the hearing would violate Rule 606(b)). Defendant has not identified any admissible evidence that he seeks to develop at an evidentiary hearing to support his argument. The juror evidence in this case amounts to evidence of the mental processes of these three jurors, and allowing evidentiary development through a hearing would undoubtedly further intrude on the jury's deliberative process. *See United States v. Benabe*, 654 F.3d 753, 780 (7th Cir. 2011) ("While due process may require a hearing to determine whether extraneous contacts may have affected a jury's ability to be fair, the standard applies only to prejudicial extraneous contacts"). Because Rule

---

[4]To the extent Defendant's claim of bias relies on certain commentary offered by the trial judge during *voir dire* in *United States v. Gore*, Defendant's reliance is misplaced. The trial judge admittedly lacked personal knowledge of the proceedings in this case, and whatever second-hand knowledge the trial judge purported to have is based exclusively on the post-verdict statements that are not competent under Rule 606(b). The Court therefore accords no weight to the commentary offered by the trial judge in *Gore*.

606(b) would bar the evidence that Defendant seeks to develop at a hearing, conducting a hearing would be "fruitless." *Morales*, 655 F.3d at 631-32 (quoting *United States v. Kimberlin*, 805 F.2d 210, 244 (7th Cir. 1986)). For these reasons, the Court denies Defendant's request to hold an evidentiary hearing.

### C.    Even if Not Barred, the Post-Verdict Statements Fail to Prove Bias

Alternatively, even if the proffered post-verdict statements would be admissible to impeach the verdict, the statements do not establish bias or present any adequate basis to "justify the extraordinary remedy of a new trial." *United States v. Warren*, 344 F. Supp. 2d 606, 608 (N.D. Ill. 2004). At trial, the Court instructed the jury that the "fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict" (R. 81 at 12), and the jury is presumed to have followed that instruction. *See United States v. Scheffer*, 523 U.S. 303, 336, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998) (noting the "strong presumption that juries will follow the court's instructions"); *United States v. Ochoa–Zarate*, 540 F.3d 613, 620 (7th Cir. 2008) ("We presume that the jury followed the court's instructions, absent evidence of an overwhelming probability that it was unable to do so.") (internal quotation marks and citations omitted).

The post-verdict statements offered by Defendant do not rebut this presumption. As a preliminary matter, it is important to recognize the limited scope of the post-verdict examination of the jurors. These jurors were participating in *voir dire* in subsequent and unrelated cases, and the examinations in connection therewith sought only to ensure that the defendants in those cases "*will* have an impartial jury," not to evaluate whether Defendant in this case *had* an impartial jury the prior week. *United States v. Hill*, 552 F.3d 541, 546 (7th Cir. 2008) (emphasis added).

To the extent any of the jurors doubted their impartiality, their concerns were largely prospective.

Insofar as the jurors drew upon their prior jury service during voir dire in the later cases, the jurors' resulting statements at best establish that several jurors recognized Defendant's decision not to testify, but not that any juror held it against Defendant for not testifying. Significantly, none of the jurors testified that the government's evidence was insufficient, or that any juror considered Defendant's failure to testify as substantive evidence of his guilt.

Juror A testified that he "wanted to hear" from Defendant, and Juror B testified that she wondered why Defendant did not testify. These post-hoc comments are not uncommon or even surprising, *see Carter*, 450 U.S. at 303 ("No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation"), and in no way demonstrate that either juror improperly considered Defendant's failure to testify as substantive evidence of his guilt. Likewise, although Juror C testified that the trial left him with some sense of unfairness, he explained that the "case was[n't] tried right," and that subsequently on his "way home" he had some conflicting thoughts about the verdict. Juror C never suggested that he considered the absence of Defendant's testimony as substantive evidence of Defendant's guilt.

Furthermore, as the government points out, other jurors – whom Defendant does not discuss – offered post-verdict testimony that Defendant's failure to testify did not weigh on the jury's decision. (*See, e.g.*, R. 91, Gov't Resp., Ex. 2, *United States v. Farella*, No. 09 CR 87, 10/6/11 Tr. at 15 (testimony of Juror D, who served on the jury in this case, that the jury wondered why Defendant did not testify, and continuing: "But he has that right, he had []that right not to testify, so we just went from there."); *id.* at 18 (testimony of Juror E, who served on

the jury in this case, that the jury "talk[ed] about Defendant's decision not to testify," explaining that the discussion "was just simply that he didn't testify, and well, that was his right, he didn't have to, and that doesn't – that doesn't, like, signify he is guilty or anything like that. He didn't commit any wrongdoing. So that was it, that was all that was mentioned.").)

In light of the record, even if the post-verdict statements proffered by Defendant are admissible under Rule 606(b) to impeach the verdict, Defendant has failed to establish to any meaningful degree that the jury improperly considered Defendant's decision not to testify in arriving at their verdict of guilty, and therefore jeopardized his substantial rights at trial. *See Eberhart*, 388 F.3d at 1048.

## II.     Sufficiency of the Evidence

Defendant next attacks the sufficiency of the evidence adduced at trial, but he fails to make any argument whatsoever in support of his claim. (Def.'s Mot. at 21.) He neither identifies a specific count in the Superseding Indictment, nor an element of any specific count, that the government failed to prove at trial. Defendant's entire discussion of the issue – consisting of two paragraphs – is a mere recitation of abstract legal principles, unconnected to the facts of this case. Under these circumstances, Defendant has waived his sufficiency of the evidence argument. *See, e.g.*, *United States v. Wescott*, 576 F.3d 347, 357 (7th Cir. 2009); *United States v. Patterson*, 213 F. Supp. 2d 900, 916 (N.D. Ill. 2002). Even if Defendant had not waived the argument, Defendant's argument nonetheless fails in light of the overwhelming evidence of his guilt presented at trial.

Viewing the evidence in the light most favorable to the government, the evidence showed that Defendant was a drug dealer who, in May of 2009, arranged with the La Familia

Michoacana drug organization in Mexico, to purchase five kilograms of cocaine on credit in Chicago. On or about May 17, 2009, Defendant made a telephone call to Panda, the organization's distributor in Chicago, and requested the five kilograms. The next day, Defendant had another individual, Lucatero, who often went by "Pelon," call Panda and arrange a meeting. That meeting occurred later that day at a Burger King, and Lucatero received the five kilograms and transported the drugs to Defendant's apartment in Chicago. Defendant and Lucatero intended to distribute the cocaine to an individual known as "Lito." Defendant informed Lucatero that "Lito" would contact Lucatero in order to deliver money from the sale of the five kilograms of cocaine.

Defendant called Panda days later to arrange for an initial payment of $60,000, and a subsequent payment of the balance of the money. The evidence showed that, on or about May 27, 2009, Defendant provided $60,000 to Panda's associates, as an initial payment for the five kilos. The jury heard a telephone recording in which Defendant told Panda to tell his associates that Defendant was wearing a black shirt, so that Panda's associates would recognize Defendant at the meeting where Defendant would make payment. Meanwhile, Lucatero had received $74,000 from "Lito," and upon Defendant's instruction, Lucatero set aside approximately $1,500 from these drug proceeds, and on May 28, 2009, met with several associates of Gonzalez-Zavala and gave them the $72,500 in cash drug proceeds. He then called Gonzalez-Zavala and confirmed that he had delivered the money.

Agents from the Drug Enforcement Agency subsequently raided a so-called stash house for the cartel in Joliet, Illinois, and recovered 54 kilograms of cocaine, 1.3 million, and a ledger that stated "May 18th, Pelon, five," evidencing the five kilograms that went to Defendant though

Lucatero.  The evidence further showed that Defendant was working with not only Lucatero and Panda, but also other individuals, namely "Cheque," who would deliver drugs, and "Oscar," who would make arrangements on the phone for the various drug-related transactions.

In light of the evidence adduced at trial, the Court finds more than sufficient evidence to convict Defendant of the various drug-related offenses with which he was charged.

## III.     Labeling of Transcripts

Defendant seeks a new trial on the basis that the Court erroneously permitted "the government to submit transcripts to the jury that had the name 'Alfonso Torres-Chaves' indicating he was the speaker."  (Def.'s Mot. at 22.)  Defendant reasons that the identity of the speaker "is a fact that the jury was tasked to find," and that by permitting the government to identify Defendant as the speaker, the Court "tainted the deliberations."  (*Id.*)  The Court disagrees.

At trial, the parties disputed the identity of the speaker in certain Spanish language recordings introduced into evidence.  The government presented three witnesses who had familiarity with Defendant's voice and who identified Defendant's voice in the recordings.  The government further introduced a plane ticket with Defendant's name that corresponded to travel discussed in the recordings.  Because the government laid a more than sufficient foundation, the Court committed no error in permitting the government to include Defendant's name on the transcript that was published to the jury.  *See, e.g.*, *United States v. Cruz-Rea*, 626 F.3d 929, 936 (7th Cir. 2010) (holding that the "names of the alleged speakers may be printed on the transcripts if a person familiar with the voices testified to the identity of the speakers"); *United States v. Breland*, 356 F.3d 787, 759 (7th Cir. 2004) (same).  Furthermore, the Court instructed the jury

regarding these transcripts:

> During trial, Spanish language recordings were admitted in evidence. You were also given English transcripts of those recordings so you could consider the contends of the recordings. It is up to you to decide whether a transcript is accurate, in whole or in part. You may consider the translator's knowledge, training, and experience, the nature of the conversation, and the reasonableness of the translation in light of all the evidence in the case. You may not rely on any knowledge you may have of the Spanish language. Rather, your consideration of the transcripts should be based on the evidence introduced in the trial.

(R. 18 at 21.) As the Court's instructions made clear to the jury, the jury was free to reject Defendant as the speaker in the transcripts.

## IV.    Spanish-language Recordings

Defendant argues that the "jurors were not screened during *voir dire* to ensure that they were not Spanish speakers who would attempt to do their own interpretation of the wiretaps. In addition, the jurors were not adequately instructed that they were prohibited from translating or interpreting the wiretaps for themselves or other jurors. This presented an unfair advantage to jurors who did speak Spanish and erroneously created a situation where a juror could become a leader due to the translation/interpretation." (Def.'s Mot. at 22-23.) Defendant does not elaborate.

As an initial matter, Defendant never requested that the Court make inquiry during *voir dire* into the prospective jurors' language abilities. (R. 71, Proposed Voir Dire by Defendant.) In any event, the Court's *voir dire* was more than adequate to ensure a fair and impartial jury. The Court has broad discretion over *voir dire*, and its questions, developed in consultation with the parties, "created 'a reasonable assurance that prejudice would be discovered if present.'" *United States v. Hill*, 552 F.3d 541, 546 (7th Cir. 2008). Defendant did not argue otherwise during *voir dire*.

Moreover, the Court explicitly instructed the jury on the issue of Spanish language recordings:

> During the trial, Spanish language recordings were admitted into evidence. You were also given English transcripts of those recordings so you could consider the contends of the recordings. It is up to you to decide whether a transcript is accurate, in whole or in part. You may consider the translator's knowledge, training, and experience, the nature of the conversation, and the reasonableness of the translation in light of all the evidence in the case. *You may not rely on any knowledge you may have of the Spanish language.* Rather, you consideration of the transcripts should be based on the evidence introduced in the trial.

(R. 81, Jury Instructions, at 21 (emphasis added).) Nothing in Defendant's argument, or the trial record, suggests that the Court's instruction was not clear, or otherwise failed to properly instruct the jury that its interpretation of the recording must be based on the evidence in the record, and not on any personal knowledge, including any knowledge of the Spanish language. Indeed, the Court's instruction is materially identical to Instruction 3.18 of the Pattern Criminal Federal Jury Instructions for the Seventh Circuit (1998). *See, e.g.*, *United States v. DiSantis*, 565 F.3d 354, 359-60 (7th Cir. 2009) (holding that district court did not abuse its discretion, where the court used "substantively identical" language to a pattern instruction).

## V.   Testimony of Jorge Ayala-German

Finally, Defendant argues that the Court should have barred the testimony of Jorge Ayala-German, a cooperating witness who identified Defendant's voice in a recording. At the time of his testimony, Ayala-German was an inmate at the Metropolitan Correctional Center ("MCC") in Chicago, Illinois. He had previously run a stash house in Joliet, Illinois for the La Familia drug organization. Ayala-German did not recall ever meeting Defendant outside of prison, but identified Defendant's voice in a recording based on his experience of living on the same floor as Defendant for several months at the MCC. In seeking a new trial, Defendant

asserts, without explanation, that the Court should have excluded Alaya-German's identification testimony as "highly prejudicial" and "unreliable." (Def.'s Mot. at 23.)

To the extent Defendant argues that Alaya-German's testimony was "highly prejudicial," his argument is misplaced. Rule 403 speaks only to "*unfair* prejudice," a claim not advanced by Defendant. *See* Fed. R. Evid. 403 (emphasis added). Additionally, Defendant fails to explain the basis for his assertion that the witness was not reliable. Consistent with Rule 901(b)(5), which governs voice identification, the witness testified that he was familiar with Defendant's voice based on his eight month experience of living in the same penal facility as Defendant. *See* Fed. R. Evid. 901(b)(5). This is more than a sufficient foundation under Rule 901, and Defendant offers nothing to suggest otherwise. *See, e.g.*, *United States v. Neighbors*, 590 F.3d 485, 493 (7th Cir. 2009) (noting that the Rule requires only "minimal familiarity") (internal citation and quotation marks omitted). The Court also instructed the jury that Alaya-German had been convicted of a crime and that the jury may consider the conviction in determining the truthfulness of his testimony. (R. 81 at 17.) The Court further instructed the jury that they should consider Alaya-German's testimony with "caution and great care." (*Id.* at 18.)

Under these circumstances, Defendant's objections to the testimony go to its evidentiary weight, not its admissibility, and therefore fail to constitute grounds for a new trial.[5] *See, e.g.*, *Cruz-Rea*, 626 F.3d at 935 ("It is ultimately the trier of fact's responsibility to determine the accuracy and reliability of the identification testimony, and when reaching its determination, the

---

[5] The Court additionally observes that two other witnesses identified Defendant's voice on the recording during their testimony, without objection. These two witnesses, together with airline records admitted at trial, provided a firm foundation for the voice identification, rending harmless any error in the admission of Alaya-German's testimony.

trier of fact may consider circumstantial evidence that tends to corroborate or contradict the identification."

## CONCLUSION

For the reasons explained above, the Court denies Defendant's Motion for Judgment of Acquittal, Arrest of Judgment or New Trial.  (R. 89.)

**Date:** December 13, 2011

**ENTERED**

_____
**AMY J. STEEVE**
**United States District Court Judge**